# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JAMES CRUM                          )
                                    )
      Plaintiff,                )
                                    )
   v.                              )      Case No. 3:04-0643
                                    )      JUDGE ECHOLS
TYSON FRESH MEATS, f/k/a            )
IBP, INC.                           )
                                    )
      Defendant.                )

## MEMORANDUM

Defendant Tyson Fresh Meats, Inc. f/k/a IBP, Inc. ("Tyson") has filed a Motion for Summary Judgment (Docket Entry No. 13) to which Plaintiff James Crum has responded (Docket Entry No. 21) and Defendant has replied (Docket Entry No. 24). That motion will be granted.

## I.  FACTS

The facts, which for present purposes must be construed in Plaintiff's favor, are as follows. These facts will be expanded upon in the argument section where necessary for purposes of the legal analysis.

Plaintiff James Crum ("Crum") filed suit against his former employer alleging race discrimination, race retaliation, racial harassment and worker's compensation retaliation. Those claims were brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; and the Tennessee Human Rights

1

Act, along with a common law claim for worker's compensation retaliation. (See Docket Entry No 1, ¶ 3).

Although Plaintiff alleges discrimination claims against Defendant based upon theories of disparate treatment and hostile work environment, as discussed herein, he has since narrowed his theories to allegations of retaliation because of his race and his filing claims for worker's compensation benefits. In his brief in opposition to Defendant's Motion for Summary Judgment, Plaintiff begins by asserting he "sues for retaliatory discharge" and focuses his arguments in his brief solely on the issue of whether he was discharged in retaliation for protected activity. He ends his brief where be began by stating in his "Conclusion" section that "[f]or these reasons, the Court should deny Tyson's Motion for Summary Judgment as to Crum's claims for retaliation." (Docket Entry No. 21, at 14). No mention is made as to any of the other claims he had originally asserted.

Crum was employed at Tyson's Goodlettsville, Tennessee plant from April 2001 until his termination on August 1, 2003. (Amended Complaint, ¶ 11). He began working as a general laborer in the Beef Slice Department but, within a few months, after his second request, he was transferred to the Load Out Department and worked there as a Picker. He remained in that position working the first shift until his termination. (Crum Depo. at 21-25, 37-39). Crum's

2

employment with Tyson ended on August 1, 2003 when he was terminated for time card fraud.

The events giving rise to Crum's termination began on July 28, 2003. On that day, he arrived at work and clocked in at his usual 6:00 a.m. time. (Crum Depo. at 100-101). At the time, Crum had just come off a surgery for carpal tunnel syndrome. Crum arrived at roll call with a note in hand from his doctor which provided he should not return to work "until MD releases for work. Follow-up appointment on July 28, 2003 @ 2:45 p.m." (Anderson Depo., Ex. 3). Upon presenting the note to David Fitch ("Fitch"), the Load Out Supervisor, Fitch told Crum that, according to the note, he was not supposed to be back at work until after his 2:45 p.m. doctor's appointment and he should therefore take the note to Health Services. (Crum Depo. at 100-101).

Crum went to Health Services and saw Amy Anderson ("Anderson"), the nurse on duty. According to Crum, Anderson told him he could go back to the doctor and try to get a release to come back to work that morning; he could wait for his 2:45 p.m. appointment; or he could go home. (Crum Depo. at 102). Crum left but did not clock out because he had been told that employees did not have to clock out for doctor's appointments since that was paid time. (Crum Depo. at 103). He was seen in the parking lot by Kim Pederson, the Nurse Manager. Crum also claims Anderson knew where

3

he was going since he was acting on instructions received from Anderson.[1] (Crofton Report, Pf. Ex. Tab 3).

Crum claims he went to the medical center to see if he could see his doctor earlier than the scheduled appointment but was told the doctor was unavailable. He then went home and took a nap because he had taken Percocet and was tired. Crum returned to the doctor's office for his scheduled appointment. (Crum Depo. at 101-102).

While Crum was away from work, his supervisors informed the Complex Human Resource Manager, Gary Denton ("Denton"), that Crum had not clocked out and was missing. It appears, however, that Denton gave Crum the benefit of the doubt and assumed he had made an honest mistake in not clocking out. (Denton Depo. at 23-24). Crum did not telephone or otherwise let someone at the plant know of his whereabout at any time after leaving the plant that morning. (Crum Depo. at 103-106).

After his doctor's appointment at 2:45 p.m., Crum returned to the plant and gave his medical documentation to a nurse. Crum claims he then went to the Load Out Department where he saw Fitch who asked him if he had clocked out earlier that day when he left the plant. Crum told him he had not, whereupon Fitch, according to Crum, told him to clock out at that time and he would fix the

---

[1]Anderson disputes this and claims Crum was supposed to be doing janitorial work in the trailer yard. (Anderson Depo. at 32-33).

error.  (Crum Depo. at 107-109).  Crum clocked out and went home, thereby creating a time record showing he clocked in at 6:00 a.m. and clocked out at 5:14 p.m.  (Fitch Depo. Ex. 1).

When Crum clocked out, he utilized a time clock located in a room adjacent to the cafeteria on a different level from where he worked, instead of the time clock he customarily used.  The time clock he utilized to clock out was located "totally away from the load out area."  (Denton Depo. at 33-34; 101-104; Fitch Depo. Ex. 1).

Upon reporting to work the next day, Denton met with Crum and interviewed him about the events of the previous day.  Crum's supervisors Fitch and Rob Nelson "Nelson" (the general foreman) were also present.  Crum told Denton his story, including Fitch's comment that he would adjust the time records.  Fitch did not affirm or deny Crum's account and remained silent during the recounting.  (Crum Depo. at 110-111).

At the time of the meeting, Denton knew that Crum had utilized a time clock locate in a different part of the plant.  (Denton Depo. at 35).[2]  When asked about it, Crum admitted that he had not punched out in the load out area, but had no explanation as to why he did not utilize the time clock located in the load out area.  (Denton Depo. at 35).

---

[2]In his deposition, Denton testified that he "beleive[d] that Mr. Crum did this to try not to be visible to the load out supervisors or the load out team members."  (Denton Depo. at 34).

5

Denton began to suspect that Crum's story was not true and that Crum was attempting to create the impression he had worked all day so he could get paid for it. Denton sent Crum home so that he could investigate the matter. Denton interviewed, and received statements from, five Tyson employees including Anderson, Fitch, and Nelson. (Denton Depo. at 23-29; 35-53).

Based upon his investigation, Denton determined that Crum most likely intended to commit time card fraud. Accordingly, Denton met with Crum on August 1, 2003, and terminated Crum's employment. If Denton had determined that Crum merely forgot to clock out, he stated he probably would not have terminated him. However, other employees who were found to have misrepresented or falsified their time have been terminated from their employment at Tyson. (Denton Depo. at 24, 47-49, 51-52 & 104-109).

At the time of the events which led to Crum's termination, Crum was recuperating from his second worker's compensation claim. On December 17, 2002, Crum reported to Health Services, complaining of pain and numbness in the right hand. This first claim was treated as a compensable injury under worker's compensation, and he was seen by Dr. Jane Siegel, an orthopedic surgeon. Crum was diagnosed as having right carpal tunnel syndrom. A carpal tunnel release was performed on February 6, 2003, and Crum was placed on restricted or light duty on February 7, 2003.

6

Crum's light duty generally consisted of performing janitorial work with one hand. He remained on light duty from February 7, 2003 until his termination on August 1, 2003. He did not miss work during this period except for time taken for doctor's appointments and physical therapy.

On March 31, 2003, Crum complained about similar pain in his left hand. He was again seen by Dr. Siegel who determined he had carpal tunnel syndrome in that hand. A surgical release was performed on July 24, 2003, and he was given a medical certificate which indicated he should not return to work until being released by his doctor. Crum was given an appointment to be examined by Dr. Siegle on July 28, 2003 at 2:45 p.m.

During Crum's employment, Tyson had an unwritten policy whereby employees who needed to visit a doctor for work-related injuries could leave the premises, see the doctor, and return without clocking out. If an employee's appointment was at the start or end of a shift, an adjustment would be made so that the time records would reflect a normal start or end time. (Crafton Depo. at 15-17).

Apart from the foregoing, Crum was involved in trying to start a union at the Goodlettsville plant at some time while he was employed at Tyson. In this regard he placed a union sticker on his hat and was told by Nelson to take it off the hat. Crum told him that it would not come off, whereupon he was given a sticker to

7

cover the union sticker.  Crum was written up for the incident and, after that incident, Crum claims Nelson "kind of had it out for him."  (Crum Depo. at 41-42).

## II.  <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving

8

party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

Although Crum initially filed suit claiming race discrimination, race retaliation, racial harassment, and worker's compensation retaliation, he has presented arguments in his brief solely with regard to his claims for retaliation under both federal and state statutes.  In this regard, Crum alleges Tyson retaliated against him because he complained about race discrimination and because he had filed claims for worker's compensation benefits.  Plaintiff also makes general assertions that Defendant retaliated against him because of his union activities, but he offers no substantive evidence to support this allegation.  The retaliation claims will be addressed later, after considering Crum's apparently abandoned claims of racial discrimination and harassment and hostile work environment.

With regard to the claims which Plaintiff appears to no longer be pursuing by failing to brief the same, this Court's review is not as searching as in the case where the matter has been fully and

fairly presented by way of response to a motion for summary judgment. In such situations, "the court is under no duty 'to search the entire record to establish that it is bereft of a genuine issue of material fact.'" <u>Spurlock v. Whitley</u>, 2003 WL 223764617, *2 (6th Cir. 2003)(citation omitted). Instead, the Court may look to the moving party's motion for summary judgment to ensure that it has discharged its initial burden. <u>Stough v. Mayville Comm. Schools</u>, 138 F.3d 612, 614 (6th Cir. 1998). Here there can be no doubt but that Tyson's has met its initial burden with regard to Crum's race discrimination, racial harassment, and union activities claims.

**A. RACE DISCRIMINATION AND HARASSMENT**

Crum has apparently abandoned his claims relating to race discrimination and harassment. In his response to Defendant's Statement of Undisputed Facts, Crum admits the following statements are true: (1) no one mentioned race during his termination meeting; (2) neither his supervisor, nor his supervisor's boss, ever made a negative statement about Crum's race or African Americans in general; (3) Denton never said anything inappropriate to him; (4) he is not aware of any documents or statements from Tyson employees that would indicated that race discrimination played a part in the employment decisions that occurred before his termination; (5) Tyson's stated reason for terminating him is that its investigation revealed that Crum had, most likely, committed time clock fraud;

10

(6) Tyson is consistent in its practice of terminating employees that commit time card fraud; (7) there is no "direct evidence" to support his opinion that race discrimination caused an alleged "disproportionate" number of white employees to be in the Load Out Department; (8) there is no evidence that the "few black guys" of which he is aware who did not receive positions in the Load Out Department were denied those jobs because of their race; (9) his allegations that there were fewer African Americans working in the "back" of the plant in higher paid jobs is based on nothing more than his personal observations; (10) he is without knowledge of the successful applicant for the Band Saw Operator position for which he applied; (11) he has no knowledge of the qualifications or experience of the two white employees who were allowed to transfer to that Department; (12) he has no knowledge of the qualifications of the white female who received the Driver position for which he applied; and (13) he has no knowledge of the female "with a foreign accent" who received the Manifestor position for which he applied. (Docket Entry No. 23, ¶¶ 22, 23, 25-34). Plaintiff's admissions in his responses to Defendant's Statement of Undisputed Facts seriously undercut his initial charges of discrimination based upon race, racial harassment and hostile work environment.

> 1. *Race Discrimination Under Section 1981, Title VII, and the THRA*

One way to establish race discrimination is to present direct evidence which, if believed, requires the conclusion that unlawful

discrimination was a motivating factor in the employer's decision. Jacklyn v. Shering-Plough Healthcare, 176 F.3d 921, 926 (6th Cir. 1999). Crum, however, has advanced no such evidence to support his claim.

In fact, Crum specifically admits that no one at Tyson ever made negative references to his race during any of the employment decisions at issue, nor were any such statement made during his termination meeting. Crum admits that neither his direct supervisor nor the supervisor's boss ever made negative statements about his race, or for that matter, African Americans in general. Likewise, Crum admits Denton never said anything inappropriate to him. Moreover, Crum admits he is unaware of any documents or statements from Tyson employees that would indicated race discrimination played a part in employment decisions that occurred before his termination.

In the absence of direct evidence, Crum could attempt to establish his claim through the circumstantial framework provided for in McDonnel Douglas. Under that approach, Crum would need to show that (1) he was a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position from which he was terminated or for which he applied; and (4) he was replaced by a non-minority or treated differently than employees outside of the protected class for the same or similar conduct. See, Singfield v. Akron Metro. Housing Auth.,

12

389 F.3d 555, 561 (6th Cir. 2004).  In this case, Tyson has conceded the first three elements and focuses instead on the last—whether Crum was treated less favorably because of his race.

The legitimate non-discriminatory reason given by Tyson for Crum's termination is time clock fraud and Crum admits this was the stated reason.  To survive summary judgment, Crum must show that other, similarly situated white employees, were not terminated despite circumstances suggesting they intentionally misrepresented their time records.

Crum has made no such showing.  He identifies no one who was treated differently than he.  Quite the contrary, while denying he committed time card fraud, Crum admits that Tyson is consistent in its practice of terminating employees that commit time card fraud.

Likewise, insofar as Crum may be claiming he was treated differently than others in regard to job placement and/or transfers or promotional opportunities, his claim must fail because he has not identified similarly situated white employees who were treated differently because of their race.  All he has on this score is conjecture and speculation.  For example, in his Complaint, Crum alleges a white applicant with less seniority, qualifications, training and experience was given a job for which Crum had applied in the Load Out Department but in response to Defendant's Statement of Undisputed Facts admits he has no knowledge of the qualifications or experience of the two white employees who

13

transferred to the Load Out Department. (<u>Compare</u> Docket Entry No. 1, ¶ 3 <u>with</u> Docket Entry 23, ¶ 31). Similarly, in his Complaint, Crum alleges he applied for a Driver position for which he was qualified but the job was given to a white female who was less qualified and had less seniority. In response to Defendant's Statement of Undisputed Material Facts, however, Crum now admits he has no knowledge of the qualifications of the white female who received the Driver position for which he applied. (<u>Compare</u> Docket Entry No. 1, ¶ 24 <u>with</u> Docket Entry No. 23, ¶ 33).[3] Likewise, Crum testified in his deposition that he believed he was discriminated against when a female with "a foreign accent" received a Manifester position for which he had applied. (Crum Depo. at 146-146). However in response to Defendant's Statement of Undisputed Material Facts, Crum admits he has no knowledge of the qualifications of the female who received the Manifester position. (Docket Entry 23, ¶ 34).

Crum's admissions undercut any claims that he was discriminated against in relation to transfers and/or promotions. In order to survive summary judgment, Crum must show that those treated differently were "substantially similar in all respects."

---

[3]Crum also complained that after a second job posting for the position of Driver, Tyson did not fill the position and this was racially motivated. (Docket Entry No. at 1, ¶ 27). However, in his deposition, Crum admitted that the position was in fact discontinued, was never filled, and he has no knowledge of why the position was discontinued. (Crum Depo. at 141).

14

<u>Gray v. Toshiba America Consumer Products, Inc.</u>, 263 F.3d 595, 599 (6th Cir. 2001).  Crum has not done so and, accordingly, his claims for racial discrimination must fail.

> 2.  *Racial Harassment and Hostile Work Environment*

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race . . .".  42 U.S.C. § 2000e-2(a)(1).  "The phrase 'terms, conditions, or privileges of employment'. . . includes requiring people to work in a discriminatorily hostile or abusive environment."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 20, 114 S.Ct. 367 (1993).

In order to establish his hostile work environment claim, Crum must show (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (4) the existence of employer liability.  <u>Hafford v. Seidner</u>, 183 F.3d 506, 512 (6th Cir. 1999).  Offhand comments and isolated incidents (unless extremely serious) do not create a hostile work environment.  <u>Id</u>.  Instead, a hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

15

create an abusive working environment." <u>Harris</u>, <u>supra</u> 510 U.S. at 21.

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." <u>Williams v. General Motors</u>, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive. " <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Id.</u> quoting <u>Harris</u>, 510 U.S. at 23.

In this case, Crum has identified six specific incidents which make up the entirety of his racial harassment and hostile work environment claims. The first incident involved a night shift supervisor named Woody who allegedly said he did not want blacks and foreigners on his shift because they could not read. Crum did not hear the comment but learned of it through others. (Crum Depo. at 46-47).

16

The second incident involved racist graffiti in the bathroom which was allegedly put there by "Wood's lead," an hourly employee. According to Crum, a hangman's noose was drawn on the wall as well the statement "F@#$ all the niggers and foreigners."  The general foreman of the Load Out Department called a meeting of the entire department and told them graffiti was totally unacceptable.  That restroom was closed to prevent any such further incidents.  (Crum Depo. at 47-50).

The third incident involved a comment allegedly made by Darryl Howell, a co-worker.  According to Crum, he overheard Howell call Tempest Pearce a "stupid black bitch."  Crum and several others then went to Fitch to complain.  Howell was taken outside by Fitch but Crum does not know if Howell was disciplined in any way.  Crum does admit to knowing of no other problems between Howell and Pearce.  Since it was not directed at him, Crum was not offended by the comment.  (Crum Depo. at 53-55).

Howell was also involved in the fourth incident.  While Crum was picking an order, Howell allegedly said "you stupid nigger, I'll shoot you right in the head."  Crum immediately reported the incident to Fitch who told him he would take care of the problem.  Fitch does not know what Fitch did to address the problem but he did not see Howell taken to the Personnel Office to be disciplined on the day of the incident.  Crum admits that Fitch investigated the incident by speaking to each of the potential witnesses

17

separately. Crum also spoke to Nelson, Fitch's supervisor, who assured Crum he would address the problem. Crum admits that Howell never again said anything offensive to him. (Crum Depo. at 53-56). Howell was suspended for three days because of this incident. (Denton Depo. at 8-9).

The fifth incident involved an altercation between Crum and another hourly employee named Mao Keo. Several employees were involved in horseplay and Keo was kicked. Crum laughed whereupon Keo said "you think that's funny, I shoot you in the head." That comment was made in front of Fitch. Fitch told Keo he could not threaten others like that. Dissatisfied with that response, Crum went to the Personnel Office and spoke with the Plant Human Resources Manager, Travis Fredricken. Crum was given a full opportunity to explain what had happened and admits the incident with Keo had nothing to do with race. (Crum Depo. at 66-81).

The sixth and final incident involved an altercation between an African American employee and a white employee named Terry Glanzer. Glanzer allegedly used a racial epithet in regard to the employee. The incident occurred in another section of the plant and Crum only heard about it through the grapevine. (Crum Depo. at 71-73).

Leaving aside the fact that these events over a two year period may not be severe or pervasive enough to give rise to a hostile work environment, fatal to Crum's claim is that he has

18

offered no evidence that these incidents unreasonably interfered with his work.[4]  Moreover, the events which Crum identified involved co-workers and Crum has forwarded insufficient proof to present a jury question as to Tyson's liability.

Every allegedly harassing incident involved conduct by hourly employees as opposed to Tyson management.  Because this is a co-worker harassment case, Crum must show that Tyson "'tolerated or condoned the situation,' or knew or should have known of the alleged conduct and did nothing to correct the situation." Smith v. Leggett Wire Co., 220 F.3d 752, 760 (6th Cir. 2000) quoting, Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999).

Crum has not forwarded evidence which would suggest that Tyson tolerated or condoned racism, be it in the form of comments or actions.  Quite the contrary, when presented with the situation of the racist graffiti in the bathroom, Tyson management called a meeting, stated such actions were "totally unacceptable," and closed the restroom to prevent any further such incidents. Likewise, when Crum complained about the statements and threat Howell allegedly made to him, Howell ended up being suspended for three days.   In sum, the record suggests that when management was made aware about any problems suggesting racial animosity, it directly addressed the issue.

_____

[4]Notably, two of the comments Crum heard about through the grapevine and another, the Keo incident, admittedly was not racially motivated.

19

**B.**  *RETALIATION RELATED TO UNION ACTIVITIES*

In his response to the motion for summary judgment, Crum includes a subparagraph in his factual overview titled "Union Activities." He claims that during his employment he was involved in trying to start a union at the plant and towards that end placed a union sticker on his hat. Crum contends in his response to the motion that after the incident Nelson "kind of had it out for him." (Docket Entry No. 21 at 9). However, Crum does not address this allegation and purported claim in his statement of the law or his arguments, nor does Tyson address it in its reply.

Crum's inclusion of a paragraph about union activities in his response to the motion for summary judgment is curious. In his Amended Complaint, under the "Facts" section, there is a vague allegation in paragraph 43 that his termination was also as a result of retaliation based upon his involvement with the union. However, his claims are described as follows: Count One is a claim for race discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981 and § 1981a; Count Two is a claim for race discrimination in violation of the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.;* Count Three is a claim for retaliation for filing a worker's compensation claim under state law; Count Four is a claim for race retaliation under Title VII, 42 U.S.C. 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1981a and the Tennessee Human Rights Act; and Count Five is a claim for racial discrimination and

harassment under Title VII, 42 U.S.C. 2000e *et seq.*, wherein Plaintiff seeks declaratory, injunctive and monetary relief.

There is no specific claim for retaliation based on union activity in any of the Counts, but supposedly, all the alleged "facts" are generally referenced to support each theory of liability. Presumably, Crum references the matters relating to union activity solely to support his actually pled claims. See, Corrasco v. NOAMTC Inc., 124 Fed. Appx. 297, 300-301 (6th Cir. 2004)(trial court properly refused to consider union retaliation claim which was insufficiently pled but evidence regarding such activities should be considered in evaluating defendant's defenses to Plaintiff's retaliation claim under Title VII). In any event, to the extent Crum may be asserting a retaliation claim based upon his union activities, it is clear that summary judgment on such a claim is warranted.

To survive summary judgment, Crum "must produce evidence that (1) he engaged in protected conduct; (2) an adverse employment action was taken against him; (3) the protected conduct played a substantial part in the decision to take adverse action; and (4) the employer would not have taken the adverse action if not for the protected conduct." Martin v. Brown-Clark, 76 Fed. Appx. 701, 706 (6th Cir. 2003). Even assuming Crum satisfied the first and second elements, his claim for retaliation based on union activity falters on the third and fourth elements.

21

All that Crum has mustered in support of his union retaliation claim is that after he placed a union sticker on his hat he was told by Nelson to take it off. Afterwards, he alleges that Nelson "kind of had it out for him." (Crum Depo. at 41). Crum does not remember when this incident occurred but believes it was four to six months after he began working in the Load Out Department, which would have been at the end of 2001 or the beginning or 2002, long before he was terminated.[5] Moreover, Denton was the decision-maker, not Nelson. Such evidence hardly shows that Crum's placing of a union sticker on his hat was a substantial factor in his termination or that Tyson would not have terminated but for that activity.

## C. *RETALIATION FOR FILING A WORKER'S COMPENSATION CLAIM UNDER STATE LAW*

Tennessee is an employment-at-will state. Nevertheless, the Tennessee Supreme Court has recognized a retaliatory discharge cause of action for an employee who has been terminated for filing a worker's compensation claim. Clanton v. Cain-Sloan, Co., 677 S.W.2d 441, 445 (Tenn. 1984).

"[T]he following elements are found to establish a cause of action for discharge in retaliation for asserting a workers' compensation claim: (1) The plaintiff was an employee of the

_____

[5]In his Amended Complaint, Crum alleges he applied for and received the position in Load Out in July of 2001. (Docket Entry No. 1, ¶ 16).

22

defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." Anderson v. Standard Register Co., 857 S.W.2d 555, 558 (Tenn. 1993). "The burden of proof rests, of course, upon the plaintiff to prove the elements of the cause of action, including a causal relationship between the claim for workers' compensation benefits and the termination of employment." Id. "Plaintiff must show the causal link by direct evidence (as where the employer has an established policy. . ., or where the employer admits the reason for the termination). . . or by compelling circumstantial evidence[.]" Thomason v. Better-Built Aluminum Prod., 831 S.W.2d 291, 293 (Tenn. App. 1992)(internal citation omitted).

Crum has no direct evidence except perhaps for a comment allegedly made by Fitch. Crum claims Fitch opined that Crum's carpal tunnel syndrome in his left hand was caused because he could only use that hand after the operation on his right hand.

On its face, Fitch's alleged statement suggests no retaliatory animus. The comment that Fitch allegedly made does not suggest that Fitch, let alone Tyson, was upset with Crum for taking advantage of worker's compensation. Crum merely speculates that this isolated remark evidences a retaliatory motive. However,

23

"[t]he plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship." <u>Reed v. Alamo Rent-A-Car, Inc.</u>, 4 S.W.2d 677, 685 (Tenn Ct. App. 1999).

In his brief, Crum conjures up a "reverse analysis" test whereby the Plaintiff in a retaliatory discharge case can "create[] a case of circumstantial evidence by eliminating any other rational explanation for the employer's action." (Docket Entry No. 21 at 10). However, even if this test were to be accepted, it does not help Crum under the facts and circumstances of this case.

Crum lists ten "facts" for purposes of his "reverse analysis" test: (1) he had a doctor's note indicating he should not return to work until seen by a doctor; (2) he was directed by Nurse Anderson to go see if he could get an earlier appointment; (3) Pederson saw Crum in the parking lot leaving and reported this to Tammy Crafton, a case manager; (4) under Tyson's policy, Crum was permitted to remain on the clock while attending a doctor's appointment during normal shift hours; (5) Crum returned after his appointment with Dr. Siegel and brought a note; (6) Crum spoke with Fitch and told Fitch he had left at 7:30 a.m.; (7) Fitch instructed Crum to go ahead and clock out; (8) Fitch told Crum he would make the necessary adjustment to Crum's time card; (9) Crum told Denton and Nelson what had transpired and what Fitch said; and (10) Fitch did not deny that he had instructed Crum to clock out. Even this

24

incomplete list[6] of "facts" does not, as Crum asserts, show "there is absolutely no alternative reason to terminate Crum's employment" other than as a result of him exercising his worker's compensation rights.

Following his termination, Crum filed a charge against Tyson with the National Labor Relations Board ("NLRB") asserting that Tyson had engaged in unfair labor practice because he was suspended on July 29, 2003, "in retaliation for his union and/or protected, concerted activities." (Crum Depo. Ex. 8). He also declared that he was terminated on August 1, 2003 "in retaliation for his union and/or protected, concerted activity." (Id). Crum's retaliation claim based upon filing for worker's compensation benefits is further eroded by a "Claimant Separation Questionnaire" submitted by Crum to the Tennessee Department of Labor and Workforce Development wherein he stated "I think I was fired for supporting a union that some employees wanted to start." (Crum Depo. Ex. 7).

The allegations by Crum before the NLRB (and indeed those here that Crum was retaliated against because of his race) wholly undercut his "reverse analysis" theory that no alternative reason existed for Tyson's decision to terminate Crum other than the fact

---

[6]Among other pertinent facts conspicuously omitted is the fact that, in checking out, Crum used a time clock on a different level and in a different part of the building from the one where he worked and normally used to clock out, and had no explanation for using that clock. Also, he did not just go to a doctor's appointment and return to work but instead went home and slept.

that he filed worker's compensation claims.[7]  By asserting in different proceedings that the reasons for his termination varied depending on the venue, Crum has effectively hoisted himself by his own petard.

Apart from the "reverse analysis" theory, Crum's remaining argument is that his suspension came the day after he returned from his second worker's compensation surgery and he was fired shortly thereafter.  However, it "is the burden of Plaintiff to establish that his claim for worker's compensation was a substantial factor in his employer's decision to terminate him." Morris v. Columbia Constr. Co., 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003).  "The plaintiff cannot meet this burden, . . . , merely by showing that the plaintiff's participation in protected activity was followed by a discharge from employment, even where the proximity in time between the two events is very short." Austin v. Shelby County Gov't, 3 S.W.2d 474, 481 (Tenn. Ct. App. 1999); see also, Conaster v. Clarksville Coca-Cola Bottling Co., 920 S.W.2d 646, 648 (Tenn. 1995)(three days between coming back from worker's compensation leave and termination insufficient, standing alone, to make out prima facie case).

---

[7]The Court is not suggesting that Crum cannot assert alternative reasons for his termination or that an employer may not have more than one reason for terminating an employee.  However, the fact that Crum claims other reasons for his termination eviscerates his claim that the only reason for his termination was the fact that he had availed himself of worker's compensation benefits.

Crum's efforts to show temporal proximity based upon his termination and filing claims for worker's compensation benefits is not persuasive in light of the undisputed record. The surgical procedure performed on Crum shortly before returning to work on July 28, 2003 was his second carpal tunnel surgery. Crum did not miss any work (except for doctor's appointments or physical therapy), he worked light duty using one hand without incident, and no one ever expressed any hostility about his limitations, his performance, or either of his worker's compensation claims. If, as Crum would have it, Tyson was trying to set him up (Docket Entry No. 21 at 11), it makes little sense that Tyson would do so after already accommodating him so generously at work and incurring the expense for two surgeries.

Even if it were concluded that Crum established a *prima facie* case, summary judgment would still be appropriate. Once a *prima facie* case is established, the burden shifts to the employer to show a legitimate non-discriminatory reason for the discharge and, if it does so, the burden reverts to the employee to show the stated reason is a pretext for wrongful discharge. <u>See</u>, <u>Speakman v. Ada Ferrell Garden Apartments</u>, 2000 WL 688711 **5-6 (Tenn. Ct. App. 2000).

Here, Tyson has forwarded a legitimate, non-discriminatory reason for its decision to fire Crum. After Denton's investigation, he concluded that Crum failed to disclose that he

27

went home and slept instead of returning to work, and he believed Crum was attempting to commit time clock fraud so he would be paid while not at work. Crum has not shown that reason to be pretextual.[8]

Crum attempts to make much of the fact Tyson has argued Crum's supervisors had no idea where he was after he left the plant to go see his doctor and efforts to locate him were fruitless, claiming this is contradicted by the record. However, merely because Kim Penderson may have seen Crum in the parking lot and reported that fact to nurse Anderson does not undermine Tyson's explanation for termination. At most it shows Health Services did not communicate this information to Crum's supervisors on that day. In any event it is irrelevant, since by the time Denton decided to terminate Crum, Denton knew Crum had left the plant that morning without clocking out, had used a different time clock when he did clock out later that day when told to do so, and failed to disclose that he went home and slept when his doctor could not see him for an early appointment. The fact remains that Crum did not clock out when he left to go to the doctor's office, went home to take a nap when he

---

[8]In his brief in opposition, Crum has a section captioned "Defendant has Failed to Establish a Legitimate Non-Discriminatory Reason and Non-Retaliatory Reason." Neither in that section nor the other sections of his brief does Crum directly address pretext. Accordingly, the Court will glean the arguments which would support a claim of pretext as best as it can from the brief which has been filed.

could not see his doctor, and Denton did not believe he was candid and truthful in explaining the events of the day.

Crum also appears to be claiming pretext because Crum alleges Fitch told him after he returned to the plant that he should clock out and that Fitch would take care of it. Although it is not clear that Fitch agrees that he told Crum he would take care of his mistake in not clocking out, this fact alone does not show pretext since Fitch did not have the benefit of the evidence which was developed during Denton's investigation, including the fact that Crum had spent a good part of the day at home sleeping while he was on the clock. In any event, the decision-maker was Denton, not Fitch. It was Denton's interpretation of the day's events which is relevant in determining whether Tyson had a factual basis for determining that termination was in order.

Crum also points to the fact that other employees who did not clock out or clock in properly were not terminated. However, Crum situation is far different from others who received lesser discipline. Crum can point to no one who clocked in, failed to clock out, left the plant to try to see his doctor, went home and slept when his doctor was not available, returned to work after his later doctor's appointment, clocked out at a different clock located on a separate level of the plant, and considered his actions to be within the policy that allowed employees to remain on the clock while away at doctor's appointments. It seems clear in

29

this case that the fact that Crum utilized a different and out-of-the-way time clock to clock out after returning from his doctor's appointment added to the specter that Crum was being devious and untruthful regarding the time allegedly worked that day. Moreover, Crum has proffered nothing to dispute that other Tyson employees who engaged in time clock fraud or falsification of time were terminated.

Effectively, Crum has shown only that he filed for and received worker's compensation benefits and was thereafter terminated. However, Crum "cannot carry his burden by simply proving that he filed a worker's compensation claim that was followed by his termination. From these two facts standing alone, no inference of causation may be drawn." <u>Morris v. Columbia Constr. Co.</u>, 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003). Since those are the only facts which Crum has established, Plaintiff has failed to raise a genuine issue of material fact on his worker's compensation retaliation claim and summary judgment is appropriate on this issue.

**D.   *RETALIATION BASED ON RACE***

Crum's race retaliation claims are brought under Title VII, the Tennessee Human Rights Act, and 42 U.S.C. § 1981. Such claims are governed by the same burden shifting formula used in Title VII retaliation cases. <u>Wade v. Knoxville Utilities Bd.</u>, 259 F.3 452, 264 (6th Cir. 2001); <u>see also</u>, <u>Austin v. Shelby County Gov't</u>,

30

3 S.W.2d 474, 480 (Tenn. Ct. App. 1999)(same elements apply whether retaliation claim is brought under THRA or Title VII).

In order to establish a *prima facie* case of retaliation on the basis of race, Crum must show that (1) he engaged in statutorily protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." <u>Id</u>. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" <u>Id</u>. at 793 (citation omitted).

In this case, Crum's retaliation claims under Title VII, Section 1981 and the THRA fail for the same reasons that his claim for retaliation under the Worker's Compensation statute fails. Crum cannot establish a *prima facie* case nor can he rebut the legitimate non-discriminatory reason given for his discharge.

In an effort to save his retaliation claims, Crum relies on <u>Singfield v. Akron Metropolitan Housing Authority</u>, 389 F.3d 555 (6th Cir. 2004) for the proposition that courts should use caution in

31

granting summary judgment once a *prima facie* case of retaliation has been established. The reason for such caution is that an employer's true motivation is hard to discern.[9]

While courts should exercise caution because motivations can be illusory, that proposition does not aid Crum because he cannot establish a *prima facie* case of retaliation based on race. In fact, on his race retaliation claim, Crum cannot take advantage of any presumption based upon temporal proximity because the last event of which he complained occurred more than a year before his termination.

As indicated, Tyson has forwarded a legitimate, non-discriminatory reason for Crum's discharge. As such, it is incumbent on Crum to show that the proffered reason is pretextual.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). Crum has demonstrated none of these things.

The evidence shows Tyson had a factual basis for termination since its investigation revealed evidence to support its conclusion Crum likely committed time card fraud. The Court is not ruling on whether Tyson's conclusion was correct, but Crum has not come forth

_____

[9]The Sixth Circuit in Singfield was dealing with a retaliation claim under Title VII. The language in that case is obviously not controlling with respect to Crum's claim alleging worker's compensation retaliation under Tennessee law.

with any evidence that shows Tyson's belief that time card fraud had been committed did not motivate its decision to terminate him. As such, Crum has not shown pretext. Furthermore, Crum has not raise a genuine issue of material fact on his race retaliation claim.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that all of Plaintiff's claims must fail. Crum has failed to raise a genuine issue of material fact as to any of said claims, and Defendant Tyson Fresh Meats, Inc. f/k/a IBP, Inc.'s Motion for Summary Judgment (Docket Entry No. 13) will be granted.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

33